J-A08015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.H.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2957 EDA 2023 |

Appeal from the Decree Entered November 20, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000345-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: S.N.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.H.B., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 2958 EDA 2023 |

Appeal from the Decree Entered November 20, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000346-2023

BEFORE:  BOWES, J., OLSON, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 5, 2024**

S.H.B. ("Mother") appeals from the decrees terminating her parental rights as to her two daughters, K.S.A., born in February 2017, and S.N.A., born in April 2019.[1]  We affirm.

---

[1] Separately, on the same date, the trial court terminated the parental rights of the children's biological father, S.A. ("Father").  Father has not appealed that decision.

We glean the following background from the certified record. On May 13, 2021, the Philadelphia Department of Human Services ("DHS") received a report from child protective services that, earlier that day, Mother had a mental health crisis and attacked both K.S.A. and S.N.A. More particularly, police responded to the residence for a disturbance and, upon arrival, observed Mother jumping from a third-story window and attempting to run into traffic. Inside the home, law enforcement located K.S.A., who was four years old at the time and suffering from cancer, with a bloody face and nose. S.N.A., then two years old, was found bleeding and unconscious, wedged between a bed and window. Both children were taken to Children's Hospital of Philadelphia. The treating doctors determined that S.N.A. had a right orbital bone fracture and tested positive for benzodiazepines. She was subsequently admitted to the intensive care unit.

Representatives from DHS spoke with the children and Father at the hospital. K.S.A. indicated that Mother was responsible for both child's injuries. Father stated that he had recently ceased his relationship with Mother and that, despite still living in the home, he was not present at the time of the attack. Father also informed that he was aware that Mother had mental health issues but believed they were under control.

After determining that returning K.S.A. and S.N.A. to Father's custody would be inappropriate, DHS obtained orders of protective custody as to both children. Upon each child's discharge from the hospital, DHS placed them into different foster homes pursuant to the recommendation of each child's

therapist.[2] In June 2021, the trial court adjudicated K.S.A. and S.N.A. dependent and committed them to the care of DHS.

Mother was arrested two days after the incident and charged with various crimes, including aggravated assault. During the pendency of these termination matters, she pled guilty to one count each of aggravated assault and endangering the welfare of children. The trial court in the criminal case sentenced her to an aggregate term of three to six years in prison, and further entered a no-contact order as between Mother and the children. Mother has remained incarcerated since the time of her arrest in May 2021. The earliest she would be eligible for parole is in May 2024, whereas her sentence maximum date is in May 2027.

Shortly after Mother's arrest, the Community Umbrella Agency ("CUA") created an initial single case plan ("SCP") for Mother, requiring her to complete a dual diagnosis evaluation. In May 2022, based on Mother's conduct, the trial court entered an order finding aggravated circumstances, which relieved DHS from its obligation to utilize reasonable efforts to reunify Mother with the children or otherwise preserve the familial relationship as between them. Nonetheless, Mother's SCP was later revised in April 2023, ultimately calling for her to attend a dual diagnosis evaluation, maintain contact with CUA, and complete parenting courses.

---

[2] The children have remained in the same respective pre-adoptive foster homes since initial placement, shortly after the assault. Despite being placed separately, K.S.A. and S.N.A. have had the opportunity to see each other every weekend and have become familiar with each other's foster families.

In August 2023, DHS filed a petition seeking to change the children's permanency goals from reunification to adoption by the respective resource parents, as well as termination of the parental rights of both Mother and Father. The court held a hearing on November 20, 2023, where it heard from CUA case manager Alexis Church, social worker Roya Paller, and Mother.[3]

Ms. Church testified that she was assigned this case in October 2021 and has managed it since that time. She contacted Mother in prison on approximately three occasions in late October and early November of 2021. Since then, Mother has made no outreach to CUA as to her reunification plan or goals. Ms. Church further said that Mother has had no contact with either child since her arrest and that the children have no relationship with Mother. She did not believe reunification was appropriate, explaining as follows:

> [Mother] has not provided anything for the children, whether it's their needs, their medical needs, educational needs, support system. She also hasn't maintained contact with CUA to ensure that, whether there was a protection order or not, that she's well aware of what's going on when it comes to their medical, when it comes to [K.S.A.]'s cancer, and things like that. She doesn't really – well she doesn't participate in [her SCP]. We have meetings for the girls. They have [individualized education program] meetings. [Mother] doesn't reach out. She hasn't signed consents or releases for the children. She doesn't have housing. We are unaware of her mental state at this point, if she is receiving treatment. If so, what kind of treatment. So[,] there [ are] a lot of safety concerns when it comes to [Mother].

N.T. Termination Hearing, 11/20/23, at 17.

---

[3] At the termination hearings, the children were represented collectively by Edward Louden, Esquire, as legal counsel, and Gary Server, Esquire, as guardian *ad litem* ("GAL").

- 4 -

Ms. Paller attested that she is a social worker who examined and spoke with both K.S.A. and S.N.A. on several occasions. When asked about adoption, six-year-old K.S.A. expressed a desire to continue living with her foster mother, whom she identified as "mom." This foster mother helped K.S.A. through her chemotherapy treatment for cancer. As to S.N.A., who was just shy of four years old at the time of the interviews, all indications were that she desired to stay in the same home as her foster parents. She had lived with them since her initial placement at age two, and accordingly these parents were the only ones she knew. Ms. Paller ultimately opined that there would be irreparable harm to both children if they were removed from the respective foster families.

Mother, for her part, testified that she wanted to be a part of her children's lives and needed more time to place herself into a position to be a parent. She indicated that CUA had not contacted her after the first few initial calls in November 2021, and otherwise did little to make her aware of her reunification goals. Mother also outlined her progress in prison, which included completing a drug and alcohol treatment program, working in the prison kitchen for a period, beginning the process of obtaining her GED, and starting enrollment in parenting courses and another drug treatment program. However, she did not introduce any documentation verifying her participation in these programs.

After testimony was taken, both the GAL and counsel for the children informed the trial court that they believed the best interests of both children

would be served by termination of the parental rights of Mother and Father. At the conclusion of the hearing, the court entered separate decrees terminating the parental rights of both parents as to K.S.A. and S.N.A. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as § 2511(b).

These timely appeals followed. The court ordered Mother to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Mother complied. The trial court entered a notice of compliance with Rule 1925(a), referring us to relevant portions of the transcript from the termination hearing, wherein it recited its findings. We consolidated the appeals *sua sponte*.

Mother presents five issues for our consideration:

I. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(a)(1) where Mother presented evidence that she tried to perform her parental duties.

II. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(a)(2) where Mother presented evidence that she is trying to remedy her situation while incarcerated, by receiving drug treatment and mental health treatment, starting parenting classes and working in the kitchen and will have the present capacity to care for her child.

III. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(a)(5) where evidence was provided to establish that the children w[ere] removed from the care of . . . Mother and Mother is now working on her goal and will have the ability to care for her children once she is released from prison.

IV.     Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(a)(8) where evidence was presented to show that Mother would be capable of caring for her children after she completes parenting classes, and has already received mental health treatment, drug treatment[,] and is employed.

V.     Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(b) where evidence was presented that Mother was denied visitation and the chance to bond with her children.

Mother's brief at 7 (cleaned up).

We begin with our well-settled standard of review.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up).

"The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G. & J.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child, which we have described as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re Adoption of B.G.S.***, 245 A.3d 700, 705 (Pa.Super. 2021) (citations omitted). The bases for termination must be proven by clear and convincing evidence, or evidence "that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Int. of M.E.***, 283 A.3d 820, 831 (Pa.Super. 2022) (citation omitted).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *See In re N.A.M.*, 33 A.3d 95, 100 (Pa.Super. 2011) (stating that "[w]e must agree with the trial court's decision as to only one subsection of . . . § 2511(a) in order to affirm the termination of parental rights). Here, we consider § 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511.

The grounds for termination of parental rights under § 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct, but may also include acts of refusal and inability to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021). We have long recognized that

- 9 -

a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***See***, ***e.g.***, ***In re Adoption of M.A.B.***, 166 A.3d 434, 443 (Pa.Super. 2017). Our Supreme Court has also indicated that,

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

***In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012). The Court further stated that "the length of the remaining confinement can be considered as highly relevant to whether the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent, sufficient to provide grounds for termination pursuant to . . . § 2511(a)(2)." ***Id***. at 830 (cleaned up).

On appeal, Mother contends that her parental rights were terminated solely based on her past incapacity, without consideration of her soon-to-be present ability to parent, in contravention to our case law. ***See*** Mother's brief at 16. She asserts that she has "substantially completed her SCP goals," including "parenting classes, employment, [and] mental health and drug treatment while incarcerated." ***Id***. Mother maintains that she will be released from prison "in the near future" and can then "provide a safe home for herself and the children." ***Id***. In short, she believes that DHS did not adequately

meet its burden pursuant to § 2511(a)(2) since, upon her release, she will have gained the capacity to care for K.S.A. and S.N.A. *Id*.

In concluding that DHS carried its evidentiary burden as to this subsection, the trial court noted the following on the record at the termination hearing:

> [M]other is incarcerated and has some limitations obviously on her ability to engage in her case plan objectives, [yet M]other has not produced any documentation through her attorney to show that she's actively been engaged in any type of mental health treatment. We don't have any documentation of the parenting [courses]. We don't have anything to show that [Mother has] done anything to remedy the situation while she's been incarcerated or that any additional time would correct the situation, if more time were given. While [M]other may be eligible for [parole in six months], she may also be in jail for several more years based on the current sentence she has.

N.T. Termination Hearing, 11/20/23, at 64. As such, the court found that DHS proved by clear and convincing evidence that Mother has not "demonstrated an ability to remedy this situation." *Id*. at 63.

Upon review, we find that the certified record supports the trial court's conclusions. The testimony from the termination hearing bore out that, after CUA initially reached out to Mother and provided her with her SCP objectives, Mother took no steps to follow up with CUA on those goals. She likewise did not contact CUA to check in on her children or to assist even minimally concerning the medical care and special needs of her children, such as by executing medical consents or releases. Aside from her self-serving testimony as to programs she purportedly undertook in prison, she did not introduce any

evidence supporting her assertions, as the trial court correctly noted. Further, assuming *arguendo* that Mother did enroll in parenting classes, by her own attestation she did not do so until after being in prison for two years and had not completed them as of the time of the hearing.

Moreover, to the extent Mother faults CUA for not providing reunification services, we note that the agency was relieved of that obligation pursuant to the trial court's finding of aggravated circumstances in May 2022. Had that order not been entered, Mother nonetheless would not be entitled to relief on that basis. **See In re A.D.**, 93 A.3d 888, 896 (Pa.Super. 2014) (finding that an agency's failure to provide reunification services alone "is not a basis to disturb the trial court's order terminating . . . parental rights").

Finally, although Mother claims to have a present ability to parent the children, she would not be in a position to do so until her release from prison in May 2024 at the soonest, and possibly as late as May 2027. The record simply belies her claim that she has the ability to remedy her incapacity and become a parent to either K.S.A. or S.N.A.

Thus, the trial court did not abuse its discretion in relying upon § 2511(a)(2) as a basis for terminating Mother's parental rights.

Turning to § 2511(b), we "consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." **In the Interest of K.T.**, 296 A.3d 1085, 1105 (Pa. 2023) (cleaned up). This analysis "should not be

applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1105-06 (cleaned up). Thus, there is no "exhaustive list" of factors that must be considered. *Id*. at 1113 n.28. While the particular circumstances of each case dictate the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up).

The Pennsylvania Supreme Court has mandated, however, that an evaluation pursuant to § 2511(b) should also consider the child's bond with his or her parent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Specifically, the court must render "a determination of whether the bond is necessary and beneficial to the child[.]" *In the Interest of K.T.*, 296 A.3d at 1113. This involves consideration of the effect of severing the child's bond with the parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *In re E.M.*, 620 A.2d at 484). The High Court has distinguished, however, "extreme emotional consequences" from a mere "adverse or detrimental impact" in the termination context. *Id*. at 1111. Specifically, it has cautioned that Pennsylvania courts "must not truncate [their] analysis and preclude severance based solely on evidence of an adverse or detrimental impact to the child." *Id*. at 1114 (cleaned up).

- 13 -

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine" the child's bond "with the **foster** parent." *Id*. at 1111 (emphasis in original, cleaned up). Thus, we consider factors that arise from the circumstances of each case, such as the child's need for permanency and length of time in foster care, whether the child is bonded with the foster parents, and whether the foster home meets the child's needs. *Id*. at 1113. Overall, "bond, plus permanency, stability and all intangible factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of primary importance in the [§] 2511(b) analysis." *Id*. at 1109 (cleaned up).

In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. Given these crucial concerns, a court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

As to this issue, Mother summarily argues, in relevant part, that "[t]he children were never permitted to visit with [her]. If [she] was provided visitation with her children[,] she could have maintained a bond with her

children." Mother's brief at 18. Notably, Mother does not discuss any aspect of the relationship between each child and their respective foster parents.

At the termination hearing, the trial court found as follows:

> With regard to [§] 2511(b), I do not find that there is a parent child relationship between . . . [M]other . . . and these two children. While the children may know who their parents are, they certainly don't look to them to meet any of their parental needs or any of their daily needs. By contrast, they look to the resource parents to do so. And I find that the children would not suffer any irreparable harm if parental rights were terminated in this case.

N.T. Termination Hearing, 11/20/23, at 66.

Again, we determine that the trial court's conclusions are fully supported by the evidence of record. Mother plainly does not share a parental bond with either K.S.A or S.N.A. Instead, both children are attached to their foster families, with whom they have resided for more than two and one-half years. While K.S.A. remembers who Mother is, she has not relied on her for any aspect of her care in that time. As to S.N.A., she has not seen Mother since she was attacked at two years old and has now spent more than half of her life with her foster parents. Ms. Paller testified that the children are thriving with their respective resource families and that to remove them from those environments would be substantially detrimental to the children. While Mother believes that in due time, she may eventually be in a position to successfully parent the children, we cannot "toll the well-being and permanency" of these children in the hope that one day transpires. *In re C.L.G.*, 956 A.2d at 1007.

In sum, the court did not err in finding that termination of Mother's parental rights would not "cause extreme emotional consequences or significant, irreparable harm." *In the Interest of K.T.*, 296 A.3d at 1109-10 (cleaned up).

Having determined that the orphans' court properly found statutory grounds for termination pursuant to § 2511(a)(2) and (b), we affirm the decrees terminating Mother's parental rights as to K.S.A. and S.N.A.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/5/2024